ORIGINAL

FILED
JUN - 8 2006
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| CHE CONSULTING, INC.,<br><br>Plaintiff<br><br>vs.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | )<br>)<br>)<br>)<br>) Case No. 06-453 C<br>)<br>)<br>)<br>)<br>) |

**VERIFIED COMPLAINT FOR**
**DECLARATORY JUDGMENT,**
**PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

COMES NOW the Plaintiff CHE Consulting, Inc. ("CHE") by and through its undersigned counsel, and files this Verified Complaint for Declaratory Judgment and Preliminary and Permanent Injunctive Relief against the United States of America regarding a procurement conducted by the United States Air Force ("Agency" or "Government"). In support of this action, CHE states as follows:

**Nature of the Action**

1. This is an action for declatory and injunctive relief pursuant to 28 U.S.C. § 1491 and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*

2. This action seeks review of three primary issues: (a) that the terms of the Amended Solicitation purposely and unnecessarily

discriminate against an entire class of the industry by preventing them from competing for this procurement; (b) that the terms of the Amended Solicitation do not treat all potential offerors on an equal basis; and (c) the Agency's decision to take corrective action in response to a protest and therefore cancel the initial award to CHE.

3. The Amended Solicitation ("solicitation") at issue seeks vendors who can perform predictive, remedial and preventive maintenance on the Agency's computerized robotic tape libraries.

4. In this regard, the solicitation requires the awardee to have agreements in place with Original Equipment Manufacturer ("OEM") to come to the awardee's assistance in the event that it cannot repair a piece of equipment within a specified time frame – generally 4 hours.

5. In other words, the awardee is required to have a back up plan in the event it cannot perform the maintenance in a timely fashion.

6. There are only 3 types of vendors that can respond to this solicitation. They are; (a) the OEM; (b) independent service organizations; and (c) third party providers.

7. An independent service organization is a vendor that has developed the technological wherewithal to perform all types of maintenance on the subject equipment independent of and without assistance from the OEM. CHE is an independent service organization with respect to the subject equipment.

8. Indeed, the independent service organization is an industry that is specifically recognized and protected by federal law.

9. For example, to ensure that such organizations would not be liable for copyright infringement, Congress enacted Section 117(c) to the Copyright Act to "ensure that independent service organizations do not inadvertently become liable for copyright infringement merely because they have turned on a machine in order to service its hardware components." H.R. Rep. No. 105-551, pt. 1, at 27 (1998).

10. OEMs, on the other hand, generally consider independent service organizations to be their direct competitors and as such, will not enter into agreements with such vendors to provide them with any type of assistance for a contract that the OEM itself failed to obtain. That is the position of the OEM in this case.

11. The last type of vendor is the third party maintenance provider. Such entities are incapable of performing maintenance on the equipment without direct involvement of independent service organizations or OEM personnel.

12. For example, Northrop Grumman Information Technology ("NGIT") is the current vendor for the subject equipment. NGIT is a third party provider because it does not have the technical capability to perform any of the maintenance requirements for the contract.

13. To make up for this obvious deficiency, NGIT subcontracted all of the maintenance requirements to the OEM. Simply put, NGIT personnel perform none of the maintenance tasks required by the contract – even though NGIT is technically considered the prime contractor.

14. The Agency in this case understands that the OEM will not enter into any agreement with an independent service organization such as CHE.

15. Rather than structure the RFQ in such a way that the Agency can verify the technical capabilities of the independent service organization – to determine if it matches the capabilities of the OEM – the Agency has chosen instead to simply discriminate against

that entire class vendors by eliminating their ability to submit a responsive proposal.

16. Moreover, the RFQ as structured fails to treat offerors in an equal fashion. Independent service organizations and third party providers are required to have a back up plan in the event they cannot perform the maintenance within a specified time frame.

17. In contrast, the OEM is not required to have a similar back up plan to obtain assistance from others in the event it cannot perform the maintenance requirements within the allotted time frame.

18. Indeed, the Agency's maintenance records for the current contract – which is being performed entirely by the OEM as a subcontractor – will reveal that the OEM itself failed to comply with the mandatory time requirements for repairing equipment on numerous occasions.

19. Thus, if the OEM cannot satisfy the maintenance time requirements, but is not required to have a back up plan, then the Agency is treating the potential vendors in an unequal fashion by mandating that independent service organizations have such a plan.

20. Finally, CHE protests the Agency's decision to cancel its initial award in response to a protest filed by the OEM.

21. When the Agency's motion to dismiss the protest was denied, the Agency chose to take corrective action. According to Agency personnel, this decision was predicated on the fact that the administrative record revealed that the best value procurement had been transformed into a low cost technically acceptable procurement.

22. Upon information and belief, the administrative record does not support this decision, thus making the Agency's decision to take corrective action arbitrary and capricious.

**Jurisdiction and Venue**

23. This Court has original jurisdiction over pre-award bid protests pursuant to 28 U.S.C. § 1491(b)(1) and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*

24. Venue is proper in this Court pursuant to 28 U.S.C. § 1481.

**Parties and Procurement Background**

25. CHE is a preeminent provider of computer hardware engineering services to the federal government, various state governments and private industry – including numerous Fortune 100 companies.

26. With respect to the procurement at issue, CHE is an independent service organization that has developed the technical capability of independently maintaining computer robotic tape libraries that were originally manufactured by Storage Technology Corporation ("StorageTek"), which is now a division of Sun Microsystems. Thus, StorageTek is the OEM for this particular procurement.

27. The Defendant is the United States Air Force, acting through the Defense Information Technology Contracting Organization ("DITCO"), on behalf of the Defense Information Systems Agency ("DISA") (collectively referred to as "Agency" or "Government").

28. On August 29, 2005, the Agency issued four separate Requests for Quotes ("RFQ") to obtain vendors who could perform predictive, remedial and preventive maintenance on the following DISA equipment: StorageCentric, MainframeCentric, PeriphCentric and CommCentric.

29. It is the StorageCentric equipment procurement that is principally at issue in this case. The Agency anticipated the award of a single firm-fixed price delivery order against the successful vendor's

General Service Administration ("GSA") Federal Supply Schedule ("FSS") contract. The delivery order was designated HC1013-06-F-2116.

30. In almost all respects, the Statement of Work ("SOW") for each of the four RFQs was identical. This includes the SOW central to this case, which involves the issue of remedial maintenance.

31. That provision, SOW C.11, which is found in all four of the RFQs, provides in pertinent part:

> **C.11 REMEDIAL MAINTENANCE:** Calls will be initiated by the site help desk or shift supervisor to the contractor's toll free service (paragraph C.7.2). Contractor is responsible for responding and repair, ***or when necessary getting required OEM support,*** in accordance with this specification. (emphasis added)

32. CHE submitted a proposal for the StorageCentric and MainframeCentric equipment.

33. The OEM for the StorageCentric equipment was StorageTek. The OEM for the MainframeCentric equipment was IBM.

34. CHE was awarded both contracts even though it did not state that it would or could obtain OEM support if needed.

35. For example, CHE's response to SOW C.11 in the StorageCentric procurement provided:

> **C.11 REMEDIAL MAINTENANCE RESPONSE:** If a call is initiated by the site help desk or shift supervisor to CHE's toll free Customer Service department, CHE will utilize its entire infrastructure of support described herein and in accordance with this specification in support of each and every remedial maintenance request for service. CHE's service engineers will ensure they first report to the site help desk or shift supervisor when arriving on site in response to remedial maintenance requests for service. Once again, please be advised due to the superiority of the CHE remote support solution tools, ELEM, ERDS and FEDAA, it will be CHE customer service support personnel notifying the CSD or satellites help desk of problems in advance.

36. Not surprisingly, for its MainframeCentric proposal, CHE provided a remarkably similar response to SOW C.11:

> **C.11 REMEDIAL MAINTENANCE RESPONSE:** If a call is initiated by the site help desk or shift supervisor to CHE's toll free Customer Service department, CHE will utilize its entire infrastructure of support described herein and in accordance with this specification in support of each and every remedial maintenance request for service. CHE's service engineers will ensure they first report to the site help desk or shift supervisor when arriving on site in response to remedial maintenance requests for service. Once again, please be advised due to the utilization of the CHE remote support solution tools, it will be CHE customer service support personnel notifying the CSD or satellites help desk of problems in advance.

37. Upon information and belief, the proposals and evaluation documents for all four of these procurements will reveal that having

OEM support agreements in place as a back up plan was neither necessary nor required by the Agency.

38. On October 26, 2005, CHE was awarded, among other things, the StorageCentric contract to perform maintenance on the Agency's robotic tape drive libraries that had been originally manufactured by StorageTek.

39. On October 28, 2005, StorageTek lodged a protest with the GAO challenging the Agency's decision to award the contract to CHE.

40. When the GAO ultimately denied the Agency's motion to dismiss, the Agency chose to take corrective action, rather than defend the award.

41. Agency personnel explained that while it believed that it could defend the award based upon the protest allegations of StorageTek, it feared that once the administrative record was released, StorageTek would learn that the best value procurement had been converted into a low cost technically acceptable procurement. The Agency believed that it would not be successful in defending such a protest ground and decided to take corrective action on that basis.

42. Upon information and belief, the administrative record will not support the Agency's claim, thereby making its decision to take corrective action arbitrary and capricious.

43. On or about January 11, 2006, the Agency cancelled CHE's award and chose to amend the solicitation and seek new proposals.

44. In communicating the changes it was making to the RFQ, the Agency specifically advised CHE that it would absolutely require proof that CHE could obtain assistance from StorageTek if it was unable to effect remedial repairs within a 4 hour time frame.

45. On February 7, 2006, the Agency released the Amended Solicitation.

46. In this regard, the Agency modified SOW C.11 as follows:

> **C.11 REMEDIAL MAINTENANCE:** Calls will be initiated by the site help desk or shift supervisor to the contractor's toll free service (paragraph C.7.2). Contractor is responsible for responding and repairing, or when necessary, acquiring any required OEM support ***without Government intervention***, in accordance with this specification.[1]

47. CHE filed an agency level protest requesting that SOW C.11 be revised to reflect the back up plan utilized by this same

---

[1] The emphasized language reflects the changes made to SOW C.11 in the Amended Solicitation.

Agency in its most recent procurement for these exact services on the same equipment.

48. By way of background, three years earlier, DISA (which is the same Agency at issue here) procured these same services for its Slidell facility in Louisiana.

49. With respect to the issue of obtaining OEM support, the Agency realized that StorageTek (the OEM for that equipment) would not provide back up support to independent service organizations such as CHE.

50. Thus, DISA structured the RFQ such that if the awardee was unable to secure OEM support for a particular maintenance requirement, the Agency would intervene and obtain such services for OEM assistance directly. Any costs associated with such OEM support would be charged directly to the awardee.

51. Recognizing that the need to obtain OEM support would be rare, the Agency nevertheless claimed that it would be an administrative burden for it to have to contact the OEM directly for this procurement and denied CHE's protest.

52. On February 15, 2006, CHE filed a GAO protest on the basis that the administrative burden of having to contact the OEM

directly on an admittedly rare basis did not justify the Agency's decision to include this restrictive specification in the RFQ.

53. CHE also maintained that by preventing independent service organizations from competing for this award, the Agency was creating a de facto sole source procurement.

54. This was so because only the OEM and third party providers could compete for the award. And since third party providers were required to subcontract all of the work to the OEM, the net result was that only the OEM could be awarded the work.

55. Without any real substantive analysis, the GAO denied CHE's first protest ground and simply ignored the sole-source issue.

56. As an independent service organization, CHE performs precisely the same type of maintenance functions at issue in this procurement for its other government and private clients.

57. Currently, CHE maintains 2,760 pieces of StorageTek equipment (which is identical to the equipment at issue in this case) in the following 22 states: Arizona, California, Colorado, Connecticut, Delaware, Florida, Georgia, Iowa, Illinois, Indiana, Kansas, Louisiana, Massachusetts, Maryland, Minnesota, Missouri, North Carolina, New jersey, Pennsylvania, Texas, Virginia and West Virginia.

58. CHE's federal government clients include: The Bureau of Public Debt; The Defense Commissary Agency; The Department of Homeland Security; The Joint Computer Center for the Military Entrance Processing Command and the Selective Service System; The Program Management Office for the Army Human Resources Command; and DISA (the same agency at issue here).

59. In addition to these federal government contracts, CHE maintains the same StorageTek equipment for Fortune 100 companies such as IBM; G.E. Capital; Equifax; Federated Stores Group; ING; At&T; Honeywell; Computer Science Corporation; Affiliate Computer Services; PGS and WesternGeco.

60. None of these government and private contracts require CHE to have any type of back up plan in place with StorageTek – and not once have these clients ever needed to obtain the services of the OEM because CHE was unable to repair a piece of equipment in a timely fashion.

**Count I – The Agency's Actions Are Arbitrary and Capricious and Contrary to Law**

61. CHE realleges and incorporates herein the allegations contained within paragraphs 1 through 60 set forth above.

62. In addition, CHE incorporates herein by reference the allegations contained in its February 15, 2006 GAO protest and its March 29, 2006 Comments to the Agency Report.

63. The Agency's decision to: (a) discriminate against an entire class of the industry by preventing them from participating in the procurement; (b) not treat all offerors on an equal basis; and (c) to cancel CHE's award by taking corrective action is arbitrary and capricious, is without a rational basis and is contrary to applicable statutes and regulations.

64. CHE has been and will be directly harmed by the Agency's improper actions.

65. Accordingly, the Agency should be enjoined from proceeding under the flawed Amended Solicitation and should be required to reinstate the original contract award to the CHE.

**Count II – The Agency's Actions Constitute an Abuse of Discretion**

66. CHE realleges and incorporates herein the allegations contained within paragraphs 1 through 65 as set forth above.

67. The Agency's decision to: (a) discriminate against an entire class of the industry by preventing them from participating in the procurement; (b) not treat all offerors on an equal basis; and (c) to

cancel CHE's award by taking corrective action constitutes an abuse of discretion on the part of the Agency.

68. CHE has been and will be directly harmed by the Agency's improper actions.

69. Accordingly, the Agency should be enjoined from proceeding under the flawed Amended Solicitation and should be required to reinstate the original contract award to the CHE.

WHEREFORE, CHE prays this Court to enter judgment in CHE's favor and against the Agency as follows:

a. Declare that the absolute requirement to obtain OEM assistance as set forth in the Amended Solicitation is improper and not in accordance with applicable laws and regulations;

b. Declare that the Agency's decision to take corrective action and cancel the initial award to CHE was improper and not in accordance with applicable laws and regulations;

c. Enjoin the Agency from proceeding under the flawed Amended Solicitation;

d. Direct the Agency to reinstate the original contract awarded to CHE;

e. Alternatively, direct the Agency to revise the solicitation such that independent service organizations are not precluded from participating in this procurement;

f. Grant CHE its costs in this action and the action before the GAO; and

g. Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

THE KELLOGG LAW FIRM, P.C.

By______________________

Steven E. Kellogg
2129 W. Main Street
Belleville, IL 62226
(618) 234-1900
(618) 234-5594 FAX
skellogg@kellogglawfirm.com

Attorney for the Plaintiff

**Certificate of Service**

I hereby certify that a true and accurate copy of the foregoing was served on the Justice Department and the Contracting Officer via facsimile this 8th day of June, 2006.

______________________

**VERIFICATION OF COMPLAINT**

I, David L. York, President and CEO of CHE Consulting, Inc. hereby declare that I have read the foregoing Verified Complaint, and can confirm that the facts as alleged are true and correct to the best of my knowledge and belief.

Date: June 2, 2006

David L. York

David L. York

Sworn to and subscribed before me this 2 day of June, 2006.

Wanda L. Grimm

NOTARY PUBLIC

My Commission expires:

12/06/2008

Wanda L. Grimm
Notary Public Notary Seal
State of Missouri County of St. Louis
My Commission Expires 12/06/2008
Commission # 04648813