IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| CHE CONSULTING, INC., | ) | |
| Plaintiff, | ) | No. 06-453 |
| v. | ) | Judge Smith |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**REPLY OF STORAGE TECHNOLOGY CORPORATION TO PLAINTIFF'S OPPOSITION TO MOTION TO INTERVENE**

Storage Technology Corporation ("StorageTek"), a subsidiary of Sun Microsystems, by counsel, submits this reply to Plaintiff's opposition to its Motion to Intervene.

## I. THE APPLICABLE STANDARD: "THE REQUIREMENTS FOR INTERVENTION ARE TO BE CONSTRUED IN FAVOR OF INTERVENTION."

As a preliminary matter it should be noted that in deciding issues relating to intervention the Court has been instructed by the Federal Circuit that "the requirements for intervention are to be construed in favor of intervention." In this regard, this Court has previously held:

> The general principle to be kept in mind in employing the method of analysis, as stated by the Federal Circuit, is that "the requirements for intervention are to be construed in favor of intervention." *Am. Mar. Transp., Inc.*, 870 F.2d at 1561. Similarly, a number of other circuits have held that Rule 24 is to be construed liberally. *Stupak-Thrall v. Glickman*, 226 F.3d 467, 472 (6th Cir.2000) (Fed.R.Civ.P. 24 is to be broadly construed in favor of prospective intervenor); *United States v. Union Elec. Co.*, 64 F.3d 1152, 1158 (8th Cir.1995) (Fed.R.Civ.P. 24 is to be construed liberally, and doubts resolved in favor of proposed intervenor);

> *Southwest Center for Biological Diversity v. Berg*, 268 F.3d 810, 818 (9th Cir.2001) ( Fed.R.Civ.P. 24(a) construed liberally in favor of intervenors); *Federal Savings & Loan v. Falls Chase Special Taxing Dist.*, 983 F.2d 211, 216 (11th Cir.1993) (any doubts concerning propriety of allowing intervention should be resolved in favor of proposed intervenor because intervention allows the court to resolve related disputes in single action).

*American Renovation and Construction Company v. United States*, 65 Fed.Cl. 254, 257 (2005).

## II. STORAGETEK IS ENTITLED TO INTERVENE AS OF RIGHT

In opposing StorageTek's intervention as a matter of right, Plaintiff makes two arguments, first, StorageTek's interest is not sufficiently direct and immediate and second, StorageTek's interest is strictly economic. As shown below both plaintiff's arguments are without merit.

### A. StorageTek's interest is direct and immediate.

CHE's argument that StorageTek's interest is not sufficiently direct to warrant intervention borders on the frivolous and is refuted by the very case on which CHE relies. The RFQ terms challenged by CHE require each contractor to provide support from the original equipment manufacturer ("OEM") (i.e., StorageTek) when the contractor is unable to return equipment to service within 4 hours by the contractor's own efforts. CHE seeks to eliminate the requirement for OEM support. If CHE prevails the contractual provision, which directly benefits StorageTek, will be removed. It is difficult to envision a more direct and immediate interest.

Furthermore, the authority relied upon by CHE, rather than supporting its position, illustrates the difference between a direct interest, such as the one StorageTek has here, and a speculative or contingent interest, for which intervention may be denied.

In *American Maritime Transp., Inc. v. United States*, 870 F.2d 1559, (Fed.Cir.1989), relied upon by CHE, plaintiff claimed entitlement to an "operating-differential subsidy" which was provided for in its contract with the Maritime Administration. Another shipping company not involved in the contract, Aeron, asserted, that if plaintiff's Israeli shipments were determined to be eligible for an operating-differential subsidy it could be damaged because it would have to compete against subsidized competition. The Court noted that, for that to occur, each and every event in an extenuated chain of events would have to occur.

> Even in the event of a Claims Court decision making AMT eligible for the subsidy, Aeron could be exposed to "subsidized competition" only if each and every one of a chain of other possible, but not certain, events were to take place. First, the Israeli Government would have to continue to make grain cargoes available for carriage by U.S.-flag vessels. AMT and Aeron would then have to be among those shipping companies having U.S.-flag vessels available to carry the Israeli grain cargoes. Next, both AMT and Aeron would have to seek the Israeli cargoes. And finally, AMT and Aeron would actually have to compete for the carriage of the same grain shipments. Short of the actual occurrence of each event in this chain, a Claims Court decision in favor of AMT could not have the competitive effect envisioned by Aeron.

*Id.* That is a far different situation from the facts of the present case where, if CHE prevails, StorageTek will be immediately damaged.

**B. CHE's Argument That StorageTek Has A Merely Economic Interest In This Matter Is Without Merit.**

**i. CHE's argument fails to recognize that, <u>in bid protest cases</u>, this Court's jurisdiction is based on having "<u>a direct economic interest</u>."**

The case primarily relied upon by CHE, *American Maritime Transp., Inc. v. United States*, 870 F.2d 1559, (Fed.Cir.1989), is not a bid protest case and predates the Administrative Disputes Resolution Act of 1996 ("ADRA"), which amended the Tucker

Act, 28 U.S.C. §§ 1491-1509 (2000), to explicitly provide for bid protest jurisdiction in this Court. Under ADRA, as interpreted by the Federal Circuit, this Court's jurisdiction, in bid protest cases, is based on protestor having "a direct economic interest." This Court has explained its jurisdiction in bid protest cases as follows:

> Under the Administrative Disputes Resolution Act of 1996 (the "ADRA"), an amendment to the Tucker Act, 28 U.S.C. §§ 1491-1509 (2000), the United States Court of Federal Claims has jurisdiction to entertain actions by "interested part[ies] objecting to a solicitation by a Federal Agency for bids of proposals for a proposed contract or to a proposed award or the award of a contract ...." *Id.* § 1491(b)(1). While the ADRA itself does not define the term "interested party," the United States Court of Appeals for the Federal Circuit has determined that Congress intended to adopt the definition provided in the "CICA", *Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed.Cir.2001).
> According to the CICA, "[t]he term 'interested party', with respect to a contract or a solicitation or other request for offers described in paragraph (1), means an actual or prospective bidder or offeror **<u>whose direct economic interest would be affected by the award of the contract or by failure to award the contract</u>**." 31 U.S.C. § 3551(2)(A) (2000); *Myers Investigative & Sec. Serv.*, 275 F.3d at 1370
>
> * * *
>
> Defendant and intervenors also argue that plaintiff is not an "interested party" because it does not have an economic interest that would be impacted by the award of the contract or by failure to award the contract. **<u>Standing, pursuant to the ADRA, is limited to parties "whose direct economic interest would be affected by the award of the contract or by failure to award the contract.</u>**" *Myers Investigative & Sec. Serv.*, 275 F.3d at 1370.

*Space Exploration Technologies Corporation v. U.S.*, 68 Fed.Cl. 1, 4, 6 (2005).

It is indeed an anomalous situation where CHE argues that intervention should be denied, in this bid protest case, because StorageTek has merely an economic interest, yet this Court's jurisdiction, <u>in bid protest cases</u>, is based upon the party protesting having a "direct economic interest." Indeed, CHE itself, which is neither an incumbent nor a

contract awardee, has "merely an economic interest" in this case. In fact, in pre-award bid protest cases, this Court routinely allows intervention by parties that have only an economic interest in the case.[1]

CHE's argument fails because it does not recognize that, in bid protest cases, Congress, in enacting ADRA, specifically granted "interested parties" a "legally protectable interest" in solicitations and contract awards. The Federal Circuit, borrowing the definition of "interested party" from CICA, has specifically held that, in bid protest cases, an interested party is one whose "direct economic interest" is affected.

With respect to what constitutes a legally protectable interest, this Court has held as follows:

---

[1] This has occurred in multiple pre-award protest cases where the government has not yet awarded the contract but an offeror is ranked highest or is otherwise in line for award in the future. *See*, for examples, *Greenleaf Const. Co., Inc. v. U.S,*. 67 Fed.Cl. 350 (2005) (Offeror filed pre-award bid protest and prospective contract awardee was allowed to intervene.); *Pikes Peak Family Housing, LLC v. U.S.*, 40 Fed.Cl. 673, (1998) (Disappointed bidder filed pre-award bid protest and competing bidder whose bid was highest ranked allowed to intervene as defendant); *ECDC Environmental, L.C. v. U.S.*, 40 Fed.Cl. 236, (1998) (Bidder brought pre-award bid protest action contesting rejection of bid as nonresponsive. Second low bidder permitted to intervene.); *Interstate Rock Products, Inc. v. U.S.***,** 50 Fed.Cl. 349 (2001) (Bidder eliminated for filing an improper bid bond and second bidder eliminated for submitting an unbalanced bid. The government determined it would cancel the solicitation and negotiate with the two bidders. When the nonresponsive bidder protested the rejection of its bid, the unbalanced bidder, whose bid was also rejected, was allowed to intervene on the government's side.) In all these cases the intervenor did not have a contract or a property interest but merely an economic interest in the proposed award.

Furthermore, in a case very similar to the present one, a protestor filed a pre-award bid protest to solicitation provisions that provided a preference for blind vendors. The incumbent blind vendor, who directly benefited from the solicitation clause, was permitted to intervene on the side of the government. *Automated Communication Systems, Inc. v. U.S.***,** 49 Fed.Cl. 570 (2001). This case is similar to the present situation where CHE is challenging a clause which directly benefits the OEM, StorageTek. StorageTek is an incumbent subcontractor and an offeror in its own right on the present procurement.

> The term "protectable" implies that the Court must actually be able to offer some protection to the interest in question. It follows, then, that in order for the Court to "protect" the interest, it must have the power to adjudicate issues relating to that interest, as the power of a court to adjudicate an issue is commensurate with the court's jurisdiction. Jurisdiction is by definition, the power to decide a case.
>
> Obviously this Court has power to decide any proposed intervenor's claim that is cognizable under the Tucker Act or any other statutory grant of jurisdiction. Moreover, the Court possesses ancillary and pendent jurisdiction that allows it to adjudicate issues that are incidental to the court's general jurisdictional authority
>
> * * *
>
> Even so, if Intervenor-Applicant can demonstrate that it possesses an interest that is "legally protectable," it will overcome any jurisdictional impediment to intervention.

*American Renovation and Construction Company, v. U.S.*, 65 Fed.Cl. 254, 260-61(2005).

In bid protests, ADRA supplies this Court with the power to adjudicate and protect the interests of offerors that are "interested parties" and "interested parties" are parties that have a "direct economic interest" in the outcome. CHE's argument that StorageTek's mere economic interest precludes intervention is without merit.[2]

**a. Ancillary jurisdiction**

---

[2] This Court has stated that an economic interest could support intervention.

> Rule 24(a) "does not require that the intervenor prove a property right, whether in the constitutional or any other sense." *United States v. City of Chicago*, 870 F.2d 1256, 1260 (7th Cir.1989); *see also Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123, 130 (2d Cir.2001) ("Rule 24(a)(2) requires not a property interest, but, rather, 'an interest relating to the property or transaction which is the subject of the action.' "). Thus, other types of interests have been found to justify intervention, **among them economic and business interests**, as well as those involving access to public resources or the enforcement of statutory rights conferred by Congress, provided these interests were legally protectable and not contingent.

*Klamath Irrigation District v. U.S.*, 64 Fed.Cl. 328, 331 (2005) (Emphasis added).

The Court also has the power to adjudicate StorgeTek's claims under the Court's ancillary jurisdiction. See *Klamath Irrigation District v. U.S.*, 64 Fed.Cl. 328 (2005), in which this Court discusses intervention under Rule 24 at length and cautions against construing *American Maritime* in an overly restrictive manner (as CHE does here) stating that to do so "it would have to conclude that the Federal Circuit intended to emasculate the changes wrought by the 1966 amendments [to Rule 24],[3] and did so indirectly, in the guise of defining what is an 'interest' within the meaning of the new rule." *Id.* at 333. With respect to ancillary jurisdiction this Court stated:

> Under ancillary jurisdiction, a court acquires "jurisdiction of a case or controversy as an entirety, and it may, as an incident to the disposition of a matter properly before it, possess jurisdiction to decide other matters raised by the case of which it could not take cognizance were they independently presented." Federal Practice and Procedure § 1917, at 460; *see also Kokkonen v. Guardian Life Ins. Co. of America,* 511 U.S. 375, 379-80, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). Because such jurisdiction springs from the necessity of effectively exercising the jurisdiction Congress actually grants, the court sees no reason why it should be distinguished from other Federal courts in this regard, at least for the limited purpose of allowing intervention by a defendant. For district courts, this ancillary jurisdiction is now subsumed under the "supplemental" jurisdiction provided by 28 U.S.C. § 1367, enacted as part of the Judicial Improvements Act of 1990, Pub.L. No. 101-650, 104 Stat. 5089.

*Klamath Irrigation District v. U.S.*, 64 Fed.Cl. 328, fn 8 (2005). The Court further stated:

> it is well-accepted that defendants intervening as a matter of right need not have independent jurisdictional grounds, but instead are covered by the doctrine of ancillary jurisdiction. In the court's

---

[3] This Court states "[i]n 1966, the scope of the rule was substantially expanded. In explaining this change, the Advisory Committee noted that the earlier wording of the rule was "unduly restricted" and prone to "poor results," finding instead that "[i]f an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene." Advisory Committee's Notes on 1966 Amendments to Fed. Rule Civ. Proc. 24, 28 U.S.C.App., p. 756." *Id.* at 329.

> view, this well-established jurisdictional doctrine, which rests on "considerations of judicial economy and fairness," *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 617 n. 14, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966), and is especially tailored for "courts of limited jurisdiction," *Morrow v. District of Columbia*, 417 F.2d 728, 738 (D.C.Cir.1969), is as applicable here as in any Federal court, all of which, of course, are of "limited" jurisdiction. Moreover, no separate waiver of sovereign immunity is required for intervening defendants, which are filing not against, but in support of the United States. *See Int'l Mortgage & Inv. Corp. v. Von Clemm*, 301 F.2d 857, 863-64 (2d Cir.1962) (while the "United States must consent to be sued," it need not "consent to be defended"); *Chalmers v. United States*, 43 F.R.D. 286, 291 (D.Kan.1967) (same). Accordingly, like the Carrollian Jabberwock, the concerns over intervention previously expressed about this court's "limited" jurisdiction ultimately prove a fiction.

*Id.* at 334 (footnotes omitted). In this case, both judicial economy and fairness are furthered by granting intervention. Judicial economy because, if StorageTek is allowed to participate as an intervenor, any decision will be *res judicata*, thus preventing the possibility that, in the event of a holding for CHE, StorageTek would immediately file its own protest to the terms of the solicitation. Fairness because the clause directly affects StorageTek and StorageTek will be "substantially affected in a practical sense by the determination made in [this] action." *Id.* at 329.

**ii. StorageTek has a substantial non-economic interest in safeguarding its reputation and the reputation of its equipment in the marketplace.**

Assuming, for purpose of argument only, that an economic interest is insufficient, StorageTek also has a very substantial interest in maintaining its reputation in the marketplace and the reputation of the equipment it manufactures. This reputation will be damaged if the equipment StorageTek manufactures "goes down" for extended periods of time and cannot be quickly restored to proper functionality. Such problems cost StorageTek's customers millions of dollars and, with respect to DoD equipment, has the

potential to threaten national security. Experience has shown that third party maintenance providers, who do not manufacture the equipment and who may not fully understand the intricacies of these very complex robotic systems are, on occasion, unable to timely repair the equipment. This was true for CHE for the very equipment which is the subject of its current protest.

The GAO, in a previous protest by CHE relating to this same agency and same equipment, upheld a much more stringent OEM requirement (that offerors obtain agreements with OEMs for a minimum of 65% of the equipment) noting the very significant problems CHE had in timely restoring the equipment's functionality:

> During the period of October 1997 through the end of November 1999, DISA experienced 517 incidents of outages on equipment under the hardware maintenance contracts, with 18 of the outages considered critical. **All involved third-party maintenance providers**. For example, during this period, **CHE was not always able to diagnose and repair equipment malfunctions on its own and had to obtain assistance from OEMs** [deleted]. In a few instances, DISA intervened to replace CHE with an OEM for repair service. In this regard, in March 1999, a [deleted] platform malfunctioned. **After CHE spent 35 hours diagnosing the problems, ordering, receiving, and installing replacement components, the platform still could not be made to function. An OEM technician properly diagnosed and resolved the problem within 2 hours of arriving on site. The total time of the outage was 53 hours.** Agency Report at 27. In another instance, **CHE performed upgrades on a direct access storage device at DMC Columbus. After eight upgraded units were returned to service, DISA experienced iterative errors for some 24 hours, resulting in a non-operational condition. DISA then called in the OEM, whose technician diagnosed all equipment, effected repairs and returned all equipment to an operational state.** The total outage time was 47.5 hours, adjusted to deduct the time spent waiting for the OEM to arrive. DMC Columbus estimated that its customers lost upwards of $4 million as a result of this service outage. Agency Report at 27-28.
> In view of the critical nature of the work performed at the DMCs on the equipment to be maintained, the potential detriment to defense missions from extended outages of that equipment, and the

> agency's own experience using contracts without OEM support, we believe the agency reasonably determined that OEM agreements represent an actual and legitimate need.

*CHE Consulting, Inc*., B- 284,110, et al., Feb, 18, 2000, 2000 CPD ¶ 51. (Emphasis added, footnote omitted)

The clause at issue will prevent the extended periods of downtime, described above, which were experienced the last time CHE attempted to maintain this equipment. StorageTek has a substantial interest in it reputation and its equipment's reputation for reliability. To the extent that the equipment experiences excessive downtime, as described by GAO above, StorageTek's reputation and the reputation of its equipment for reliability suffers. The clause at issue here will protect StorageTek's reputation and the reputation of its equipment because, if a third party maintenance provider is unable to repair the equipment in a timely fashion, the OEM must be called in to make the repair, which experience has shown can then be accomplished expeditiously. *See CHE Consulting, Inc*., *supra*.

## II. STORAGETEK SHOULD BE PERMITTED TO INTERVENE PERMISSIVELY BECAUSE ITS DEFENSE SHARES COMMON QUESTIONS OF FACT AND LAW WITH THE PRINCIPAL ACTION

If it is determined that StorageTek is not entitled to intervention of right, this Court should exercise its discretion and permit StorageTek to intervene permissively in the litigation. Permissive intervention is appropriate where an applicant's claims or defenses share a common question of law or fact with the main action, and the intervention would not unduly delay the action or prejudice the rights of existing parties. RCFC 24(b)(2). The Court must also consider whether the intervenor will significantly contribute to a full development of the underlying factual issues and to a just and

equitable adjudication of the legal question presented. See Olympus Corp. v. United States, 627 F. Supp. 911 (E.D.N.Y. 1985) aff'd, 792 F.2d 315 (2d Cir. 1986).

In the present case StorageTek's presence will significantly contribute to a full development of the underlying factual issues because, CHE has specifically brought issues pertaining to StorageTek and its ***alleged*** policies into this litigation. CHE has alleged in its Complaint that it is StorageTek's policy not to enter into agreements with independent service organizations or to provide them with any type of assistance. Complaint at 10, 14, 49. Similarly, CHE is alleging that the requirement at issue creates a "de facto sole source procurement." This is untrue. StorageTek can provide evidence regarding a number of companies that have approached StorageTek regarding maintenance for this effort and which will be submitting bids, this same evidence was presented by StorageTek to the GAO.[4] The totality of this information is not available to the government and effectively refutes CHE's "de facto sole source procurement" allegations.[5]

---

[4] This evidence supplied to GAO included information which CHE had not provided to GAO, for example, the identity of another competitor for this procurement, Dynamic Systems, Inc. CHE's allegation that "StorageTek falsely claim[ed] it contributed to the development of the GAO protest by supplying evidence that companies, other than CHE, were able to obtain an OEM support agreement from StorageTek" is in error. CHE Opposition at 10.

[5] CHE has never approached StorageTek regarding obtaining support for this procurement and StorageTek does not have an agreement to support CHE. Furthermore, StorageTek and CHE are currently engaged in extremely adversarial litigation in federal court where StorageTek has alleged that CHE has violated its intellectual property rights and CHE has countersued alleging antitrust violations among other things. While CHE may not have an agreement to obtain OEM support, other companies do have such agreements. CHE has not alleged that any company, other than itself, has been unable or unwilling to secure a support agreement from the OEM, StorageTek. The fact that CHE has no such agreement is a fact peculiar to its own particular circumstances.

StorageTek's defense of the RFQ provisions requiring OEM support clearly shares common issues of law and fact with the main action. StorageTek's participation will contribute to the full development of the underlying factual and legal issues. StorageTek's Motion to Intervene has been timely made and its participation will not hinder the speedy resolution of this matter as StorageTek can comply with the schedule already established by the Court without any delay being required. Accordingly, StorageTek should be granted leave to intervene permissively in this action.

## CONCLUSION

For the foregoing reasons, StorageTek's Motion to Intervene in this action should be granted.

Respectfully submitted,

s/ John J. O'Brien

John J. O'Brien
COHEN MOHR, L.L.P.
1055 Thomas Jefferson St., N.W.
Suite 504
Washington, D.C. 20007
Tel: (202) 342-2550
Fax: (202) 342-6147

Attorney of Record for Storage Technology Corporation

Of Counsel:

David S. Cohen
COHEN MOHR, L.L.P.
1055 Thomas Jefferson St., N.W.
Suite 504
Washington, D.C. 20007
Tel: (202) 342-2550
Fax: (202) 342-6147

Dated: June 26, 2006